Your Honors, and may it please the Court, Kathleen Sullivan for the defendant, Block, Inc. Your Honors, we ask you to reverse a preliminary injunction in this trademark infringement case under the well-settled sliding scale framework this Court has long applied for preliminary injunctions from the data phase case and later precedents. And that is that this Court undertakes careful evaluation of the merits of likelihood of confusion, in this case, the merits here is likelihood of confusion, where the balance of equities is strong. And here, the Court granted a trademark infringement preliminary injunction against my client, Block, based on an extraordinarily weak record of likelihood of confusion, but with a very, very severe penalty. So we respectfully suggest that there's a heavy burden, and to cite this Court's framework as well, the Court has long said, in cases like Dakota Industries, that the defendant, sorry, that the plaintiff has an especially heavy burden, where the preliminary injunction would effectively give the plaintiff all the relief they could expect in a decision on the merits. Now, I'd like to start, Your Honors, with- Can I ask a question before you start? The likelihood of confusion is a fact question? It's a fact question, but it's a de novo, it's subject to clearer- That's my next question. Clearer view on the facts, Your Honor, for sure, but- So clearer on the question of likelihood of confusion. Not on the ultimate question, Your Honor. Clearer on the facts supporting the likelihood of confusion. De novo review on the legal standard, or the legal framework, by which that's being evaluated. Calvin Klein, that's your president, saying there's de novo review on the legal framework. But with respect to- Wait a minute, I'm, the finding of likelihood of confusion, which is an element of the data phase factors, are we reviewing that for clear error, or de novo? Facts for clear error. Well, what is it? Legal framework for de novo. Is it a legal framework, or is it a fact question? It depends on the finding, Your Honor. Let me be specific. Maybe we could go specifically through the findings. Let's go through likelihood of confusion. And I'd like to, there's a great deal of evidence my adversary has pointed to in the record, but I'd like to break down the likelihood of confusion into a couple of simple buckets. And let's start with where most trademark cases, unlike this one, really begin, with consumer surveys that ask, would you confuse the defendant's cash app taxes tax filing product with H&R Block's tax filing product? And we can take consumer surveys off the table, Your Honor, because the district court took it off the table at addendum 51 in the district court's decision. So I'm not gonna drag you into the battle of the experts here, Your Honor. We think we had the gold standard survey and theirs was defective. But Your Honor, at addendum 51, the district court took the consumer surveys out of her calculus because she said they cancel each other's out. So let's look at the rest of the evidence on likelihood of confusion. And I do wanna get to your question, Your Honor, as we look at each bucket. First bucket of the remaining evidence is really just three of them. How about that third party evidence, those supposed media reports and social media posts, those tweets and posts in which, aren't those evidence of confusion? Now, Your Honor, we think it's a legal question whether it was correct to consider third party evidence that was not something the defendant put out into commerce. Lanham Act is about what the defendant uses or distributes in the market through advertising, marketing and branding. And you could make the argument that actually it was legal error to consider that evidence at all. But we certainly think it was factually clear error to think that that evidence was probative of consumer confusion. And let me say why, Your Honor, the third party evidence, I commend Your Honor's attention to it, it's not long. The sum total of these market data pieces is at addendum pages 73 to 76. And those are not articles where a journalist said, hey, I just opened up this new product, cash app taxes by H&R Block. Oh, well, I thought it was an H&R Block. Those are not what that is. It's some algorithm put articles about H&R Block and My Client Block and companies with HR. It was just a robot looking for name searches. Like if your law clerks go back to Chambers and they look up the Eighth Circuit and they get the Eighth Circuit Parish in Louisiana. A simple connection through a word search is not a person who was confused. And Your Honor, the social media posts are similarly valueless. And we think it would be clear error to give them any substantial value. You can read those too. They're reviewed at appendix pages 258 to 262. And again, these are not folks who said, hey, I just went on cash app taxes and I thought it was an H&R Block product. Not at all, not one of them. Instead, they say things like, gee, H&R Block is going to be, and I'll just use the euphemism, peeved. Or they state an opinion that the name change of Square to Block is a dumb change. Or they say, well, gee, I see there's litigation about this. There are comments on the litigation. None of them evinces confusion. So Your Honor, I'm willing to say maybe you want to announce new law about third party evidence and say sometimes it can come in. It can come in, obviously, if we're planting the evidence in the media. That's the heaven, hell, bourbon case. We can't use the media to get out a confusing message. But that's not this case. And my friend on the other side admits it. This is a case where the social media posts and the market screeners are just not relevant. They're not systemic, they're not pervasive, they're isolated. And above all, they show that the actual people who made the posts knew that there was a difference between the two companies. You can't say H&R Block is gonna be mad at Block unless you know they're not the same. So Your Honor, I think you have to, as a factual matter, to give important weight to the third party evidence would be clear error. Let me turn to bucket number two, Your Honor, because- Well, that would be a legal error, right? We believe it's legal error to consider third party media statements that are not probative of confusion. Under Calvin Klein, that's the wrong legal framework. Correct, Your Honor. Okay, but do you have any cases that we could rely on for that proposition? We don't have any cases in this circuit, Your Honor. There are cases that other circuits that have discounted social media posts, like the Kinder case cited in our brief. But Your Honor, I know that social, I don't wanna say you have to announce a categorical rule in 2022, no social media posts. They might be probative in another case, but they're not in this one. So we believe it was legal error to give them any weight, and alternatively, as a fallback, it was clear error to credit them where they don't evince confusion. I wanna be sure I tick off the other boxes. Let me ask you, though, aren't some of those posts people at least discussing that, gee, it looks like maybe Block changed his name to Block and started this tax service to create some confusion with H&R Block? You're not, Your Honor. And let's remember the district court found the intent, the supposed intent of the defendant neutral, so the district court didn't think that we did anything with intent. We bought Credit Karma Tax long before, we acquired the tax service long before the name change. So there really can't be any, there was an error on the district court to think there was any connection, but the district court didn't weigh intent. What I want to really get to, Your Honor, is the key. Let me tell you where I'm going, and then maybe you can, if that is at least some evidence that is at least slightly probative, and we're on a clear error standard, how do you win likelihood of success? That's- Data phase, Your Honor, because the remedy here is extremely harsh, and I want to get to why it's so harsh, but I want to knock off the other evidence first. All right, let's set aside likelihood of success, irreparable harm, balance of equities. Can you name a single case that flipped an injunction based on balance of equities? Purely on balance of equities? Yes. I'll try to come back to you on rebuttal, Your Honor, if I may, because I'm going to run out of time on my buckets, and I want to do all my buckets, if I may. There's just two more I want to cover with the court. One is terms of service and privacy notice. My adversary may tell you, well, if you go through the consumer journey, this is what the experts call it, you open your cash app on your phone. Most users, most of our 44 million active users open the cash app on their phone. Some might do it on another mobile device. It takes you through many, many pages, and what do you see? Cash app, a strong brand in its own right. Cash app. By the way, free tax filing service. Have you seen Block yet? No. You go through many, many screens and many, many pages. If you look up your free tax filing service, it gets you to something called Cash App Taxes, not something called Block. Please don't take this from me, Your Honors. This is described for you in the D.A.R. Declaration at Appendix 226 to 236, and in the Jennings Declaration at Appendix 106 to 146, where you can see these screens. Now, I wouldn't be standing here if you got onto the Cash App screens and the Cash App Taxes screens, and they said, Blocks Cash App or Blocks Cash App Taxes, but they don't, Your Honors. In order to see the word Block anywhere, you have to go down to the fine print that takes you to the Terms of Service and the Privacy Notice, the legal documents that were required to disclose and do so with great care. You have to look down into the fine print of those to see the word Block, and Your Honors, I commend your attention if you look at no other case from a sister circuit, the Armstrong-Cork case from the Fifth Circuit, in which the court said, okay, well, Armstrong-Cork claimed, changed its company name to World, but there's a world carpet, and now on the Armstrong labels, they put a little teeny tiny word World under the great big Armstrong Circle A trademark. Well, this is that case. If you have to get to Block through all those screens, and it's in the fine print, it's Armstrong, it's not confusing. And Your Honor, let me turn now to the balance of equities because I don't want to run out of time. I hope what I've persuaded you is that the evidence here is extraordinarily weak, and some of it was legally improper to consider because it didn't show. And let me cite to you the most important language in any of your prior decisions, it's VTEC, where the court admonished us that what's relevant is the decision the consumer makes in the purchasing decision. My basic argument to Your Honors is all of this evidence, the social media posts, the Block in the fine print, this is not showing that Block tries to create any confusion or does create any likelihood of confusion in the purchasing decision. And why are the equities so harsh? Your Honor, this is not a typical trademark case where a preliminary injunction would make us change an ad slogan or a jingle. And if we had been saying cash out taxes by Block or Block's cash out taxes, then of course you could have had a standard trademark injunction that told us to stop doing that, just call it cash out taxes, take the word Block out of your jingle. This injunction is really unprecedented in the intrusion it makes into an American company's corporate governance structure. It's giving us four choices, Your Honor. Extract cash out taxes from Cash App. Well, we can't do that. It's wired into Cash App. It took us many millions, tens of millions of dollars to get it there. We had to wait a year to do it. And if we pull it out, it's like pulling the car radio out of the car. It can't work as a standalone. So that's not feasible, and it would cause great loss to our goodwill if we had to do that. Second option, suspend or sell Cash App taxes. Your Honor, we can't sell it. I commend Your Honor's attention to Appendix 920 and Paragraph 22. This is our signed agreement. Appendix 920, Paragraph 22 is our signed agreement with the Attorney General of New York. Remember how we got into this? Intuit that owns TurboTax, Big Monopolist, threat to free tax services, DOJ and New York let us come in, acquire Credit Karmatex, because we're going to provide competition in free tax services, and we agreed not to divest until 2024. So we can't sell it. Third option, reincorporate Cash App as a new corporate entity. Well, Your Honor, there's a lot of deadweight loss from all the legal work that's involved, but it's not just that. Reincorporation squanders our goodwill. And then at the end of the day, Your Honor, I ask you to look at the last sentence of the operative Paragraph 1 of the Injunctive Relief. It's at Addendum 67. It says Cash App taxes cannot be owned by a legal entity with the word block in it. So respectfully, we don't see how we can recreate a new corporate entity that's a sub and not be owned by block and defiant. So this comes down to the last thing, and I'll end here, Your Honor. What the injunction is really driving us toward is an option that's highly intrusive and is irreversible. And that's to change our name back to square, only in order to change it back to block again if we win. And Your Honor, I commend your attention to the first savings bank case cited in the blue brief at page 48. It's almost unarguable that a double name change in the course of a litigation is irreparable harm to us. If we're subjected to that, Your Honor, they ought to have a pretty darn strong case of consumer confusion in the purchasing decision. They do not. And respectfully, we ask that you reverse. I'd like to reserve the rest of my time for rebuttal. Very well. Thank you, Your Honors. May it please the Court, I'm David Bernstein, and I represent H&R Block. Your Honors, if I told you that Block was introducing a new service through a cash app that would let you file your taxes online, who would you think that was from? That question is at the heart of this case. Now, the district court found that my client is widely known by the name Block alone. And that's a finding that the defendant doesn't challenge on appeal. We are Block. And when it comes to taxes, Block means us. Block means H&R Block. Now, this appeal, Your Honor, rests on three fallacies. We believe the court should affirm because number one, there was no error in the court's detailed extensive findings of fact. Number two, there was no error in the court's assessment of the expert evidence that Ms. Sullivan discussed. And number three, there was no error in the court's injunction. And I hopefully will try to hit all three of those points in the 14 minutes I have left, Your Honor. Mr. Grimstein, it strikes me that the likelihood of success, the confusion question, which I think is a fact question which we reviewed for clear error, but the evidence seems extremely thin to me. There's no, the traditional is to do consumer surveys. None of that. The logos, they're green. One's got a dollar sign in the middle. One doesn't have anything. It clearly says block on most of yours. Theirs doesn't say block. At best, it's in a footnote 10 pages away. It just seems, and then the consumer, the third party evidence seems awfully thin too. So correct me where I'm wrong here. Thank you, Your Honor, for that opportunity. So first of all, I agree with Your Honor that the standard here is clear error. I don't agree with Ms. Sullivan that the assessment of the factors is decided as a legal issue. That may be true in some other circuits, but it's not true here. And in the Select Comfort case just last year, the court made clear that the whole assessment of likelihood of confusion is done for clear error. And the district court heard a lot of evidence, and I'd like to review that briefly. So first of all, Ms. Sullivan jumps right to the evidence of actual confusion. But in this court, when we're thinking about likelihood of confusion, we look at the squirt co-factors. And three of the squirt co-factors, the court found, were very strongly in our favor. So number one, what's the strength of the mark? The district court found that the block trademark is very strong. 65 years of use, hundreds of millions, if not billions of dollars behind it. Widely known as block. Commercially strong and conceptually strong. Number two, how similar are the usages? The court found that the defendant is making lots of use of block. And I'm going to give Your Honor some examples in a moment. The defendant comes in and says, we're not using it as a trademark. First of all, they applied to register block as a trademark. And I'll review with Your Honor all the ways they're using it. But it actually doesn't matter whether they're using it, quote, as a trademark. The question under the Lanham Act is, are they using it in commerce? And they make a lot of use of block in commerce. So the similarity of the marks, the court said, very strong for us. That's at addendum 34 to 41. And the third huge factor on sport code, Your Honor. Let's drill down a little bit on what you just mentioned. The use of block in public. I suspect they do use it in other connections. But what about in connection with cash app taxes or whatever? I think that's what it's called. Yes. So Your Honor, when they changed their name, they tweeted to the world, block is cash app. And even today, on their Twitter feed, at the very top of the feed, they have pinned a message. That means it stays at the top, no matter how many additional tweets come out. And it says, block is cash app, as well as their other subsidiaries. And Mr. Dorsey, their CEO, who is obviously a very, very famous Missourian, Mr. Dorsey has millions and millions of followers. And he tweeted, we're changing our name. Block is now cash app. And he also tweeted, cash app lets you file your taxes. When you go to cash app, Your Honor, more than 150 times they use the name block. Now Miss Sullivan would have us say, oh, that's just fine print. But first of all, if you're doing your taxes, the IRS requires that you agree to a consent to share your information on the taxes. And that consent form says that Block is the company that is providing this service. In addition, Your Honor, the privacy policy, something when you're sharing your most sensitive personal information, the privacy policy says when you share your tax information with us, you're sharing it with Block. And Block can share with all of its other companies. And the terms of service repeatedly talk about this coming from Block. So what you had is Mr. Dorsey tweeting block is cash app. On their website, their block.xyz website, it continues to say block is cash app. Cash app is one of our building blocks. One of the types of confusion that that causes, Your Honor, it's kind of the reverse of the select comfort case that looked at initial interest confusion. This is a kind of reverse confusion. They're talking about cash app being a building block in Block. We're concerned that people will think we're part of the Block family, that we now are one of the building blocks in their family. That's problematic. And I think one of the most interesting things they do, Your Honor, is when consumers complain about cash app taxes, they complain to the Better Business Bureau. The Better Business Bureau publishes these complaints and gives the defendant an opportunity to respond. And when they publicly respond, they say, so sorry. You had that problem. We're going to try to address it for you. Block. They sign their response publicly. Block. The very moment when consumers are unhappy with the cash app taxes service, they say, that comes from us. Block. We don't want people to think that's us. And I would ask you to look at Appendix 1, 2, 3, 7 for examples of how they do that, signing these responses coming from Block. That's harm to us. Is there evidence? What is the evidence as to how often that's happened? You know, Your Honor, we had no discovery. And so this is a very quick preliminary injunction hearing. We did put evidence in on that. I don't believe the record reflects one way or the other how many of those complaints there were. But every single complaint we found was signed by Block. Now, the third party evidence, I don't agree with Ms. Sullivan that you need to go out on some limb and create some new law, because this court has already established the law. So the key issue is in, actually, the Select Comfort case, where Your Honors talk about how should a district court go about assessing these court co-factors. And what this court says is, you've got to look at the totality of the factors. You have to think about, what are the considerations that a consumer would go through? And there are other stakeholders that I'd like to address as well. But what are the considerations that a consumer might be influenced by? And this court said, you should assess that using common sense. Now, here's what's common sense. They told the media, cash app is Block. Cash app lets you file your taxes. And Professor Ribstein, who is a marketing expert, one of the six experts in this case, talked extensively about the fact that the media has a huge impact on consumers' perceptions. And because of that, companies go out of their way to solicit the media to report on their new products and services. They arm the media because they know consumers actually believe what they read in the media with less skepticism than what they see in advertising. And what Professor Ribstein explained is that the defendant went out of their way to tell the media, we've got this new tax service. You should report on it. And the media did report on it. PC Magazine had a whole article about the different ways that consumers can file their taxes online. They talked about TurboTax. They talked about H&R Block because H&R Block does allow consumers to file their taxes online for free if your tax returns are relatively simple through an app, just like they have an app. Our app is called MyBlock. We have a website as well. And then the article says, and there's a new service. It's Block's Cash App. You could file your taxes on Block's Cash App. And Your Honor, that is in the appendix, in the separate appendix at 1050. And there was another article, which is at 1080, that did the same thing, that talked about the fact that you can file your taxes on this new service. It's Block's Cash App. Now, Your Honor, they will say, oh, we didn't say that. But they're the ones who armed the media with that. And it is common sense, if you rely on what this court taught us in Select Comfort, that consumers would be influenced by that. But they did it. Ms. Sullivan said, oh, we didn't plant it. I actually disagree. They did plant it. They have a media kit, where they tell the media how to talk about Block's new businesses, including Cash App. So Your Honor, I believe that the evidence of actual confusion was actually quite strong. But you know what? That's not what the district court said. What the district court said is that the six, if you look at the squirt co-factors, three of them are very strongly in our favor. Strength of the trademark, similarity of the marks, and the competition. Because we offer exactly the same service under the exact same mark to the exact same customers using the exact channels of trade. The judge assessed all of the evidence of confusion. There were tweets. And actually, I think it's worth looking at the tweets. The day they announced that they were changing their name, people said, wow, that is dumb, as Ms. Sullivan put it. Don't you know H&R Block is in this space? Don't you know H&R Block has a green Simple Square logo? The day they announced, before the lawsuit, someone else tweeted, are you saying H&R Block is acquiring Square? That's confusion, Your Honors. So you've got tweets in the marketplace. You've got their own conduct of using the name Block more than 150 times on the app and website. You've got their own conduct in responding to Better Business Bureau complaints when people are most unhappy, saying this is from Block. All of that together contributes. And then you have confusion where the news media has a page on their website about H&R Block. So it's the H&R Block page. It has our ticker symbol. And it lists articles that are relevant to what we're up to. The very first article under Market Screener, and the district court talks about this in the decision, says Block is offering a new tax filing service under Cash App. And by the way, I also don't think it's necessarily an issue that we all need to decide today. But I don't agree that Cash App is a strong brand. I mean, Venmo is a Cash App. PayPal is a Cash App. They're entitled to use a very, very weak, very, very descriptive trademark if they want for their service. But a Cash App, an app that lets you manage your cash, that's the weakest that there is. And so it's not surprising that the media, when they talk about it, has to say which Cash App it is. That's why they say Block's Cash App, so you know which Cash App it is. All of that, Your Honor, contributes to the confusion. But the district judge said, this factor slightly favors H&R Block. It was the three first squirt-go factors I decided, that I discussed, that most strongly support. And I would say, Your Honor, that those three alone would be enough to show a likelihood of confusion. Now, Ms. Sullivan also says something about intent, which I don't agree with. It is true that at the end of the day, when the court assessed the totality of the squirt-go factors, she said, I will treat the intent factor as being neutral. But she did find, and this is at addendum page 46, that the evidence suggests that there was an intent by the defendant to trade on H&R Block's reputation. Ultimately, she didn't feel it was appropriate at the preliminary injunction stage to put weight on that. She wants to leave that for trial. But I don't want to leave the suggestion out there that the court found there was no bad intent. The court just didn't let that factor into the decision. I've got a minute, so let me very, very briefly touch on two other points. Number one, on the expert evidence, there was a lot of expert evidence here. There was a survey showing that we're known as Block. They objected. The district court overruled that and said, no, I find that survey credible. They're not appealing that. That's not in dispute. There was a lot of marketing experts. Professor Ribstein, Professor Darr talked about the corporate structure, branding issues, house of brands, branded houses, does that matter? The district court relied heavily on Professor Ribstein throughout her decision. And again, that's not being appealed. The only thing on expert evidence they complain about are the surveys. They had a survey that showed there was no confusion when you showed the Cash App logo alone. We had a survey that showed that there was confusion when you actually show articles talking about what Block is up to. And so, Your Honor, there was survey evidence. But what the court found was that you had these two surveys. There were a lot of critiques on both sides. They came to different conclusions. For these purposes, they canceled each other out. Mr. Bernstein, you're about out of time. But can you briefly respond to the argument about the balancing of the equities? Absolutely, Your Honor. And I appreciate the extra time to do that. The district court heard a lot of evidence on that. Mr. Jennings testified about it. First of all, there was zero evidence of something Ms. Sullivan said, which is that it cost tens of millions of dollars to put Cash App taxes together. There was zero evidence of that. There was evidence of how much it cost to make the name change. I'm not going to say that number publicly, because it was submitted under seal. Your Honors could look it up. But what Mr. Jennings testified about was that he spends hundreds of millions of dollars a year marketing Cash App. The amount of money it costs them to change their name from square to block was a tiny, tiny fraction of that. There is no hardship in their going back. In 2021, Your Honor, they offered tax filing for free online through the Credit Karma app. They had bought Credit Karma. And they continued to run the Credit Karma app. In 2021, they did free tax filing on a separate app. The tax season is over this year. 2022 is in the books. This injunction is all about 2023. And that's why we appreciate that the court did expedite this appeal so it can be decided before the 2023 tax season. There is no reason that this company, one of the most powerful fintech companies in the world, and the district court said this, with a huge number of engineers and lawyers at their disposal, cannot, for 2023, have a new app, just like they did in 2021, to do the tax filing. And it would not be nearly as difficult, as they say, to change the name. Now, the district court heard evidence on that. And you see it in the opinion. The district court found that their concerns were overstated. Look, I've been on both sides of preliminary injunctions. Every time you're trying to get out from a preliminary injunction, you always say, oh, my god, the sky is falling. But we know that Chicken Little does not really come into court that often. Defendants always say that, Your Honor. All right, Mr. Bernstein. Thank you. Thank you very much. Ms. Sullivan, I allowed Mr. Bernstein to go over. So I'll give you three minutes in rebuttal. Thank you very much, Your Honor. Three quick points. Common sense is not the standard in this circuit. This court rejected common sense in Calvin Klein and said we don't look subjectively to a comparison of perfume bottles. We look to objective empirical evidence. That evidence is missing. Calvin Klein was not overruled by select comfort in any respect. Second point, and this is really the key, Your Honor. Even taking everything my friend Mr. Bernstein said about Block saying Block is cash app or Block is cash app taxes. What's missing there is the causal link to confusion between cash app taxes and H&R Block. You can't issue a preliminary injunction based on likelihood of success on a triple bank shot. Maybe somebody would have heard that Block is cash app. And maybe somebody heard that cash app taxes is cash app. And so maybe somebody might think when they're looking at cash app taxes that, oh, that must be H&R Block. If that were the case, Your Honor, Mr. Bernstein with his powerful arsenal of experts should have given us a survey that showed it. That all that inferential pile of inferences about, well, Block is cash app, and cash app is cash app taxes, and cash app taxes is tax filing, and H&R Block does tax filing. Isn't that confusing? Your Honors, he can't just assert it as a matter of common sense. It's not common sense. And it wasn't in the record. Did you find a case that reversed a preliminary injunction based on balance of equities alone? I did not, Your Honor. And we did check. What I do have for you, I think, is a solution to the standard of review, Your Honor. The standard of review here is abuse of discretion. And abuse of discretion under data phase at the preliminary injunction review stage asks you to look more carefully at the merits. That is, demand more showing from the plaintiffs the more severe the injunction is. So we think, as a totality, it's an abuse of discretion to issue a clearly erroneous preliminary injunction based on clearly erroneous. I'll accept clear error for the likelihood of confusion, Your Honor. It's clearly erroneous, where the burden is high, to find that there was likelihood of confusion here. And the punishment is harsh. And with respect, the district court was most incorrect to bond this at $250,000. And it's, frankly, really just not credible for Mr. Bernstein to say, oh, it's no big deal to change a brand. Branding is American commerce. And to change your brand is an enormous investment. And to roll it back and roll it back again is irreparable harm. Let me ask this. Isn't it sort of inherently suspicious that Square becomes block shortly after acquiring, or some period of time after acquiring, a tax filing company? It's not correct, Your Honor. It's clearly erroneous to say they were contemporaneous. Because remember, what happens is credit karma tax stays embedded in credit karma from 2020 all the way for two more years until we are ready to, after great investment, move credit karma tax into cash app as cash app taxes. So the acquisition preceded the name change by two years. It's simply factual clear error to say that they were contemporaneous. I didn't say they were contemporaneous. I said sometime after. Well, Your Honor, I want to just go back. The district court found, and Mr. Bernstein asks you to credit her findings, that intent was neutral here. And so she had the opportunity to find that we were intending to free ride on the HR block. She expressly declined to find that. And I do not think that that ruling was clearly erroneous. But Your Honor, I just want to close with a simple analogy. This is a case in which the parent company changed its name to Block. But it's undisputed in this record that we never use Block in the consumer-facing advertisements or branding of cash app taxes. Please look at the pages in the record where you go through the screenshots and you'll see that it's true. If Procter & Gamble owns Bounty Towels and we go out and buy our Bounty Towels, you would have to prove that a name change to Procter & Gamble would affect our view of whether we're buying Bounty Towels or somebody in the name change. And Your Honor, that's what makes this case so weak on likelihood of confusion. It's the House of Brands and the facts here. We respectfully submit that on abuse of discretion, you should reverse this injunction, prevent irreparable harm that might force us to change our name, and send this case on expeditiously for the next phase of the merits. And I agree with Mr. Bernstein. We thank you for the expedition of this appeal. Thank you, Your Honors. Thank you, counsel. Interesting and difficult case, and we'll do our best to issue an opinion in due course. Thank you, Your Honor. Thank you.